THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| COMMODITY FUTURES TRADING COMMISSION, | ) ) ) | 7:05CV5026 |
| Plaintiff, | ) ) | **MEMORANDUM AND ORDER** |
| vs. | ) ) | |
| TODD J. DELAY, | ) ) | |
| Defendant. | ) | |

Figuring out whether another person harbored a wrongful intent is a very hard thing to do.  One should avoid cynicism while at the same time eschewing credulity. This difficulty is compounded when the facts are torturously complex and clearly suspicious, but a close examination also reveals the possibility of benign motivations.

An extended non-jury trial[1] has presented me with loads of evidence, and the parties have taken four months to provide me with lengthy post-trial briefs detailing their respective positions.  After careful consideration, I find and conclude that the defendant, Todd J. Delay, did not knowingly engineer sham transactions as claimed by the plaintiff, the Commodity Futures Trading Commission.  That is to say, the Commission has failed to prove by a preponderance of the evidence that Delay manipulated or attempted to manipulate the feeder cattle futures market, or that the cattle sales information he caused to be reported was false or misleading.  While oversimplified for the purpose of clarity, I next explain why I arrived at this opinion.

---

[1]A jury was picked, and one day of evidence was presented.  Sensing that the glazed eyes of the jurors did not bode well for a rational outcome, the plaintiff and the defendant wisely agreed to narrow the claims and waive a jury.  I dismissed the jury, and the case proceeded as a bench trial.

# I.  INTRODUCTION

The Commission charges that Delay, who is a commodity broker and cattle feeder, illegally manipulated or attempted to manipulate the price of the feeder cattle futures contract traded on the Chicago Mercantile Exchange ("CME") by falsely reporting feeder cattle sales to the United States Department of Agriculture ("USDA").  Specifically, it is claimed that Delay engineered five sham transactions that caused the CME feeder cattle contract to trade at artificially high prices after October 24, 2003, and to settle artificially higher at the contract's expiration on October 30, 2003.  Delay allegedly violated Section 9(a)(2) of the Commodity Exchange Act, which makes it a felony for:

> Any person to manipulate or attempt to manipulate the price of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, . . . or knowingly to deliver or cause to be delivered for transmission through the mails or interstate commerce by telegraph, telephone, wireless, or other means of communication false or misleading or knowingly inaccurate reports concerning crop or market information or conditions that affect or tend to affect the price of any commodity in interstate commerce, . . ..

7 U.S.C.A. §13(a)(2) (West Supp. 2006).

The Commission's claims require a close examination of Delay's reasons for entering into the five reported transactions, and, ultimately, of Delay's credibility.  Although the transactions are highly suspicious, and it is undisputed that the October 2003 settlement price of the CME feeder cattle futures contract was affected by the transactions being reported to the USDA, Delay has provided legitimate explanations for his actions that the Commission has not been able to disprove.

The first reported transaction ("Transaction A") involved an oral agreement for the sale of 606 feeder cattle.  The Commission claims that Transaction A violated

-2-

the statute because the cattle were never delivered to the buyer and Delay did not have authority to sell the cattle. I am not persuaded that Transaction A was a sham or that Delay acted with an improper motive. Basically, I conclude that (a) the sale was rescinded because the cattle were sick; (b) Delay did not know that the cattle were sick when the sale was reported to the USDA; (c) there is no requirement that the USDA be informed when sales are rescinded; (d) it is common practice for both the buyer and seller to back out of cattle sales when cattle are sick; and (e) given Delay's significant investments in and exercise of control over the entity that owned the cattle, and based on past dealings, Delay had a good faith reason to believe he was authorized to sell the cattle. Moreover, and despite the fact that Delay may not have fully and accurately responded to the Commission's post-sale inquiries, I am persuaded that any such errors resulted from the complex nature of the numerous fractional interests that Delay and his investors owned in the various entities and pens of cattle that were involved in this transaction, and not from an intent to hide what happened. I also draw no adverse inference from the buyer's failure to volunteer information to the Commission during its investigation.

The second reported transaction ("Transaction B") involved an oral agreement for the sale of 124 feeder cattle that was subsequently cancelled. I find that this was a *bona fide* transaction because (a) the cattle were considerably underweight when they were delivered; (b) the buyer offered to rescind the transaction because it had selected the pasture where the cattle had been grazing and felt responsible for the condition of the cattle; (c) at the time of contracting, Delay and the buyer made a good faith estimate of the weight of the cattle; (d) it is common practice to use estimated weights when buying and selling cattle directly; and (e) the USDA does not require parties to notify it when a reported sale is cancelled. The buyer's failure to promptly notify the Commission of the cancellation is likewise immaterial.

The third reported transaction ("Transaction C") involved the sale of 666 feeder cattle. The Commission alleges that Transaction C was a sham because Delay

later arranged for the buyer to resell the cattle, and suggests that the subsequent buyer derived a windfall profit that was intended to buy his cooperation in connection with the Commission's investigation into Transaction A. I find no evidence to support this accusation. Instead, I find that (a) the original buyer, a large feedyard operation, resold the cattle because its bank was demanding a reduction in inventory; (b) the contracting parties' use of estimated weights and current prices at local livestock auctions was in accord with common practice; (c) feed bills were erroneously sent to the sellers after the date of sale but were not paid; and (d) a delay in payment for the cattle was due to paperwork problems caused by the method used to finance the cattle and by the large number of investors and hedge accounts that were involved, and does not indicate that Transaction C was intended to be a "pass through" sale.

The fourth reported transaction ("Transaction D") involved the purchase of 1,598 feeder cattle that the Commission claims took place before the applicable reporting period. While some business records of the feedyard seller appear on their face to support this claim, the evidence presented at trial shows that (a) the "lot hard card" for the cattle likely was completed at two different dates, and thus does not establish the date of sale; (b) a cattle purchase invoice was destroyed and replaced because it erroneously listed the seller's original purchase price rather than the agreed-to sales price; and (c) feedyards customarily charge cattle buyers for feed charges that were incurred prior to the date of sale. The Commission's contention that Delay or his investors actually paid feed charges prior to the reported purchase date is not established by the evidence.

The fifth reported transaction ("Transaction E") involved the sale of 1,538 feeder cattle to a feedyard that had financed the cattle for Delay's investors. The Commission compares this sale to Transaction C because Delay subsequently arranged for the feedyard to resell the cattle to another person at the going market price. Even though this transaction might be characterized as a "pass through" sale, I find that (a) the cattle were sold to the feedyard because Delay's investors wanted

-4-

to realize their profit; (b) it was common for the feedyard to purchase "opportunity cattle" for resale prior to slaughter; (c) the feedyard was at risk of loss for the cattle for over a month following the sale.

In addition to these five reported transactions, the Commission claims that Delay unsuccessfully tried to buy 5% of all cattle of reportable weight at a feedlot on the condition that the owner would falsely report to the USDA that 100% of the cattle had been sold. I find that Delay actually offered to purchase the cattle with a 5% down payment, which, although much less than the industry standard, was a legitimate offer under the circumstances. The fact that Delay wanted a report of the proposed sale made to the USDA does not indicate wrongful intent.

In summary, while I cannot fault the Commission for investigating Delay's activities or for bringing this civil action,[2] I am persuaded that the five feeder cattle transactions Delay initiated in mid-October 2003 were legitimate business deals. Transactions A and B fell through, but they were properly reported to the USDA at the time the agreements were made; Transactions C and E were also reportable sales even though the cattle were resold a short time later; and Transaction D took place on the date that was reported to the USDA. The sixth transaction, which was not consummated or reported, was also a legitimate business deal.

Delay and his investors admittedly realized profits in the futures market as a result of these feeder cattle transactions, but they were lawful profits. Simply stated, it is not a violation of the statute to report feeder cattle sales to the USDA with the intention of moving the CME index up or down—rather, to be unlawful, the reported sales must be sham or nonexistent transactions, or the reports must be knowingly

---

[2] I am of the opinion that the Commission's position was substantially justified, such that an award of attorney fees to Delay under the Equal Access to Justice Act would not be proper. See 28 U.S.C. § 2412(d)(1)(A).

false or misleading.  In this case, it turns out that the sales were real and the reports were true.


## II.  FINDINGS OF FACT

Pursuant to Federal Rule of Civil Procedure 52(a), my findings of fact and conclusions of law are set forth below.[3]

### A.  The Parties

(1)  The Commodity Futures Trading Commission is an independent federal agency responsible for administering and enforcing the Commodity Exchange Act. (Uncontroverted Facts.[4]) The Commission is specifically authorized to seek injunctive relief and civil penalties for violations of the Act.  *See* 7 U.S.C. § 13a-1.

(2)  Todd J. Delay, who resides in Columbus, Ohio, was registered with the Commission as an associated person of Rosenthal Collins Group, LLC ("RCG"), a registered futures commission merchant, from May 16, 2002 until September 2, 2005.[5]

---

[3] Any finding of fact more properly characterized as a conclusion of law, and any conclusion of law deemed to be a finding of fact, should be so construed.

[4] "Uncontoverted Facts" are set forth in the order on final pretrial conference (filing 294, superseding filing 272) and have been stipulated to by the parties.

[5] The complaint in this case also alleged that Delay violated the Commodity Exchange Act by exceeding the speculative position limits for the October 2003 feeder cattle futures contract, and by failing to diligently supervise the handling of commodity interest accounts at RCG's Columbus office.  These claims were dismissed by agreement of the parties at the same time that the right to trial by jury was waived.  (Tr. 109-13.)

(Uncontroverted Facts.)  He is a commodity broker with over 18 years of experience in the futures and securities industry.  (Tr. 662 (Delay).) [6]

(3)  Delay has been active in feeding cattle since 1998 and holds a 50% interest in Lloyd Neil & Son, a Nebraska farm that primarily produces corn and soybeans and owns brood cows and feeder cattle, and a 25% interest in Neil Cattle Company, a Nebraska company engaged in feeding cattle.  (Tr. 663 (Delay).)

(4)  On occasion, Delay has bought and sold cattle from North Platte Feeders, Inc. ("NPF"), which is a futures customer of Delay.  Jack McCaffery ("McCaffery"), who resides in North Platte, Nebraska, is the president of NPF.  (Uncontroverted Facts.)  McCaffery was dismissed as a defendant before trial, without prejudice, in exchange for his truthful testimony at trial, his agreement to cooperate with the Commission, and his waiver of any claim for attorney fees or costs under the Equal Access to Justice Act.  (Filings 293, 298.)

(5)  John D. Lawless ("Lawless"), who resides in Imperial, Nebraska, is the feedlot manager at Imperial Beef, a feedlot located in Imperial, Nebraska.  Delay is a customer of Imperial Beef and feeds cattle at Imperial Beef both for himself and investors in his cattle feeding investments.  (Uncontroverted Facts.)  Lawless was also dismissed as a defendant before trial, without prejudice, on the same terms as McCaffery.  (Filings 242, 252.)

(6)  On May 11, 2006, following the trial of this matter, a final judgment of dismissal with prejudice was entered in favor of both McCaffery and Lawless.  (Filing 338.)  The judgment was entered on the oral motion of these former defendants, and without any objection by the Commission or by Delay.  (Filing 337; Tr. 879-83.)

---

[6] References to the trial transcript ("Tr.") (filing 341) include the page number and, in parentheses, the name of the testifying witness.

### B.  The USDA Daily Report Of Feeder Cattle Transactions

(7) Feeder cattle are young steers that are sent to feedlots for finishing into "fat" cattle for slaughter.  (Uncontroverted Facts.)  The USDA issues a daily report of feeder cattle transactions, which covers both auction and direct sales.  Auction sales are public and take place in auction barns.  Direct sales are privately negotiated non-public sales.  Direct sales are voluntarily reported to the USDA, at the discretion of the parties to the transaction.  The USDA generally reports auction sales on a daily basis, but reports direct sales on a weekly basis on Fridays. (Uncontroverted Facts; Tr. 53-54, 107 (Kass).[7])

(8)  Any agreement between a buyer and seller to exchange feeder cattle for cash within a 14-day pick-up period is regarded as a reportable cash market transaction; the date of the transaction is the day that the agreement is made, not the final delivery date for the cattle.  (Widga [8] Dep.[9] 66–67.)

### C.  The CME Feeder Cattle Futures Contract

(9)  The Chicago Mercantile Exchange, Inc., is a registered entity and a designated contract market for trading feeder cattle futures contracts pursuant to Section 5 of the Commodity Exchange Act, 7 U.S.C. § 7.  The CME's principal place of business is in Chicago, Illinois.  The trading venues for the feeder cattle futures

---

[7] David Kass is employed by the Commission as a senior economist.  (Tr. 31.)

[8] In October 2003, Dennis Widga was the USDA's livestock market news reporter in Torrington, Wyoming, and was responsible for reporting cattle sales from the western Nebraska region. (Widga Dep. 12-13.)

[9] Designated portions of each referenced deposition ("Dep.") are contained in Exhibit 420, with the exception of the depositions of Wade Horton (Exhibit 1122) and Charles Flaming (Exhibit 1123).

contract include the CME's trading floor in Chicago, and the CME GLOBEX electronic trading platform.  (Uncontroverted Facts.)

(10)  A CME feeder cattle futures contract consists of 50,000 pounds of feeder cattle, with a minimum price fluctuation or "tick" of $0.00025 per pound, which equates to $12.50 per contract.  During the trading day, the maximum price increase on a single feeder cattle contract from a limit move is 120 ticks above or below the previous day's settlement price, which equates to $1,500 per contract. In practice, the feeder cattle futures contract is quoted in dollars per hundred-weight.  The CME's feeder cattle futures monthly listings include: January, March, April, May, August, September, October and November. During the relevant time period, to meet the specifications for inclusion in the CME feeder cattle futures contract, cattle were required to be steers of average weight between 700 and 849 pounds that were USDA graded #1 Medium or Medium/Large frame.  (Uncontroverted Facts.)

(11) Unlike most futures contracts, the CME feeder cattle futures contract cannot be settled by delivery of the physical commodity; that is, it is a cash-settled contract and no physical delivery of cattle ever occurs. (Uncontroverted Facts;  Tr. 35-36, 144-45 (Kass); Tr. 834 (Manaster).[10])

(12)  The cost to a person buying or selling a feeder cattle futures contract is determined at the time the contract is bought or sold, not at the end date of the contract.  A person who buys a feeder cattle futures contract is obtaining both the obligation and the opportunity to buy the equivalent of the commodity (*i.e.*, feeder cattle) at some time in the future.  Conversely, a person who sells a feeder cattle futures contract is obtaining both the obligation and the opportunity to sell the equivalent of the commodity (*i.e.*, feeder cattle) at some time in the future.  (Court's Exhibit 1.)

---

[10] Steven Manaster, an expert retained by Delay, is a professor of finance at the University of Colorado.  (Tr. 818.)

(13)  Until the settlement date, the market value of any feeder cattle futures contract is set by offers and acceptances in the futures pit at every moment the pit is open.  This is what one might call the futures market price.  (Court's Exhibit 1.)

(14)  By way of example, if one buys a feeder cattle futures contract for $88 per hundred on Day 1, then someone else must have sold that same feeder cattle futures contract for $88 per hundred on that same date.  If the price of a feeder cattle futures contract on Day 2 is $90, then the person who on Day 1 acquired the opportunity to buy has made $2, as of Day 2, because he has the opportunity to buy the equivalent of feeder cattle worth $90 for $88.  In order to realize his profit, however, he must sell his opportunity to buy on Day 2.  Correspondingly, the person who on Day 1 acquired the opportunity to sell feeder cattle at $88, has lost $2, as of Day 2, because he must sell the equivalent of feeder cattle worth $90 for a price of $88.  In order realize  his loss, however, he must sells his obligation to sell on Day 2.  (Court's Exhibit 1.)

(15)  Futures are used by those in the cattle business to help mitigate the risk of their cash transactions and inventory.  (Tr. 88-89 (Kass).)  For example, a person who plans to buy cattle in the future may buy a futures contract (or make a "long hedge") to protect against rising prices; conversely, a person who plans to sell cattle in the future may sell a futures contract (or make a "short hedge") to protect against falling prices.  (Court's Exhibit 1.)

(16)  The final settlement price for the CME feeder cattle futures contract is the value of the CME's feeder cattle index on the delivery date, which, with certain exceptions not relevant here, is the last Thursday of the contract month.  The CME calculates that index on a daily basis using a weighted average of feeder cattle prices reported by the USDA for the previous seven days. (Uncontroverted Facts.)

(17)  The CME feeder cattle index is a seven-day weighted average of USDA prices on feeder cattle auctions, direct sales, video sales and Internet sale transactions

-10-

from a twelve-state region:  Colorado, Iowa, Kansas, Missouri, Montana, Nebraska, New Mexico, North Dakota, Oklahoma, South Dakota, Texas, and Wyoming. (Cook[11] Dep. 16-17; Exhibits. 123, 125.)

(18)   The CME extracts information from the USDA daily reports of feeder cattle transactions pertaining to reported sales of cattle meeting the specifications for inclusion in the CME feeder cattle index.  Under the CME's rules, the index includes all eligible sales reported by the USDA.  Because the CME calculates the feeder cattle index using a weighted average of feeder cattle sales, the greater the size of a reported sale, the greater the effect the sale will have on the index.  (Uncontroverted Facts.)

(19) The CME views the index as a benchmark price that can be used to form an opinion about trends in the underlying cash market for feeder cattle.  (Cook Dep. 36.)  However, numerous cash markets exist in the twelve-state area, and the prices for feeder cattle in these cash markets can vary considerably for the same time period. Because the CME feeder cattle futures index translates the many local cash market prices into a single national futures price, the index price is not equal to the cash price in any individual market.  (Tr. 840-43 (Manaster); Tr. 101-02 (Kass).)

(20) Because the index includes only those direct sales that are voluntarily reported to the USDA, it represents only a small percentage of the total feeder cattle sale transactions.  (Tr. 105-107, 120-121 (Kass); Cook Dep. 47.)  Moreover, some states disproportionately report their sales.  (Tr. 160-65 (Kass).)  For example, Nebraska, Montana, Wyoming, and the Dakotas, where feeder cattle typically sell for higher prices than in southern states, are underreported compared to southern states. (Tr. 462-63 (McCaffery).)  The CME actively encourages voluntary reporting, as the larger the sample the more accurate the index.  (Cook Dep. 53-55.)

---

[11] John Cook is associate director of the CME commodity research and product development department.  (Cook Dep. 5.)

### D.  October 2003 Feeder Cattle Transactions

(21)  During October 2003, Delay requested McCaffery or Lawless to report five direct feeder cattle sales to the USDA so that the sales would be included in published reports.   (Uncontroverted Facts; Tr. 706, 721-22 (Delay); Tr. 461 (McCaffery); Tr. 261, 273-74 (Lawless).)    The five reported sales, which were referred to throughout trial as Transactions A though E, involved a total of 4,532 head of cattle.

(22)  The USDA reporting guidelines give reporters the discretion to exclude sales that are above or below the general price range of cattle from the reports. (Exhibit 6, p. 2.)  Here, the USDA reporter verified through independent sources that the reported prices of Transactions A through E were within the market price for Nebraska cattle.  (Widga Dep. 107-11.)

(23)  On Friday October 24,2003, the USDA issued its feeder cattle report for the preceding seven days.  The CME feeder cattle futures contract closed at the greatest possible price permitted under the rules for the contract (*i.e.*, "limit up") on that date.  (Uncontroverted facts.)

(24)  The settlement price for the October 2003 feeder cattle futures contract was based on the CME feeder cattle index value on Thursday, October 30, 2003. (Uncontroverted facts.)

(25)  Each of the reported sales by Delay and his investors, Transactions A through E, caused the CME feeder cattle index to settle at a different price that was a higher price than the price at which it would have otherwise settled on October 30, 2003.  (Uncontroverted Facts).

(26)   October 2003 was an extremely volatile month in the feeder and live cattle markets.  (Tr. 673-75 (Delay); Tr. 776-79 (Hayenga)[12].)

## 1.  Transaction A

(27)   On or about October 18, 2003, Delay and McCaffery reached an oral agreement for North Platte Feeders ("NPF") to purchase 606 head of feeder cattle for an average price of $1.1250 to $1.1325 per pound.  (Tr. 705-07 (Delay); Tr. 465-66, 506-07 (McCaffery); Exhibit 1099, pp. 1-2 (McCaffery).[13])  The estimated weight was 710 pounds for 485 head, and 825 pounds for 121 head, based on a November 1st delivery date.  (Exhibit 1099, p. 2 (McCaffery).)

(28)   McCaffery and Delay determined the price for Transaction A cattle by evaluating the prevailing prices in the Nebraska sales barns; the agreed upon price was the "going market price" for cattle in Nebraska.   (Tr. 465-66 (McCaffery); Tr. 705 (Delay).)

(29)   Feeder cattle bought or sold that are scheduled for delivery are reportable as of the sale date even though delivery has not occurred.  (Widga Dep. 66-67.)

### a.  Rescission of Transaction A

(30)   At the end of October or first part of November, Delay called Matt Neil ("Neil").[14]   At that time, Neil informed Delay that the cattle were sick and that he

---

[12]  Marvin Hayenga, an expert retained by Delay, is a professor emeritus of economics at Iowa State University.  (Tr. 770.)

[13]  Exhibit 1099 is a declaration signed by McCaffery on March 10, 2005.

[14]  Matt Neil owns 31% of the Neil Cattle Company and manages the feedlot. (Tr. 218 (Neil).)  Neil testified that he told Delay at some point, possibly in late

-13-

wanted to keep them at the feedlot.  (Tr. 707-08 (Delay).)  Neil reported that the cattle were experiencing a 3% death rate, which is twice the normal rate.  (Tr. 707-08 (Delay); Tr. 230 (Neil); Exhibit 2006.)

(31)  On November 3, 2003, Delay called McCaffery to let him know that the cattle had health problems and a high death rate.  The parties jointly decided to rescind the sale.  (Tr. 707- 08 (Delay); Tr. 466 (McCaffery).)

(32)  There is no requirement to report to the USDA that a transaction previously reported was not completed. (Widga Dep. 85-86.)

(33)  Rescinding a contract because of the health of cattle is not unusual.  It happens several times a year at North Platte Feeders, which does not want sick animals coming into its feedlot.  (Tr. 466-67 (McCaffery).)

### b.  Delay's Authority to Sell Transaction A Cattle

(34)  Delay is a vice president of Neil Cattle Company and personally owns 25% of Neil Cattle Company.  (Tr. 250 (Neil); Tr. 663 (Delay).)

(35)  Delay and his investors own 49% of Neil Cattle Company.   They have personally guaranteed a $3.5 million line of credit that enables Neil Cattle Company to buy and sell cattle; Neil Cattle Company did not have a line of credit prior to Delay and his investors purchasing their interest in the Company.  (Tr. 711-12 (Delay).)

---

October or early November, that he did not want the cattle sold, but that he did not learn of Transaction A until after that conversation, when, in late November, Delay showed him a letter from the Commission regarding the reported sale.  (Tr. 221, 227-28 (Neil).)

(36)  Delay and his investors would not have guaranteed the line of credit if Delay not believe he had the authority to buy and sell cattle without the prior approval of Neil.[15]  (Tr. 713 (Delay).)

(37)  There was an established past practice of Delay buying and selling cattle on behalf of Neil Cattle Company, without prior approval from Neil, and without receiving any complaint that he lacked the authority to do so.  (Tr. 709-10 (Delay).) In fact, Delay had purchased Lot 724, part of the 606 head of cattle involved in Transaction A.  (Tr. 710-11 (Delay); Tr. 231 (Neil).)

(38)  Delay held a reasonable belief that he had the authority to sell cattle without Neil's prior permission.  (Tr. 711-12 (Delay).)

(39)  Neil and Delay discussed the status of the Transaction A cattle, including their estimated weight and price, a number of times during October 2003.  (Tr. 227 (Neil).)  Delay did not learn that Neil wanted to keep the cattle in the feedlot until after he and McCaffery had arranged the sale.  (Tr. 707-08 (Delay).)

### c.  The Commission's Investigation of Transaction A

(40)  In November 2003, the Commission requested Delay to identify all cattle transactions during October 2003 where he was the buyer, seller, or broker, or where an entity in which owned at least a 10% interest was the buyer, seller, or broker. Delay responded to the Commission's request but failed to identify Transaction A. (Tr. 753-54 (Delay).)

(41)  On November 24, 2003, McCaffery received a written request from the Commission asking him for information concerning transactions A-D.  This was the

---

[15] Neil testified that only he had authority to sell cattle on behalf of Neil Cattle Company.  (Tr. 219 (Neil).)

first notice of any inquiry from the Commission. (Tr. 485-86 (McCaffery); Exhibit 305.) The letter specifically requested McCaffery to provide the Commission with (a) the number of cattle he owned (or in which he had greater than a 10% interest or control in) as of the close of business each Friday date in October 2003, including the locations of the cattle and weights of the cattle, and (b) a list of all of the transactions he was involved with for the month of October 2003. For each transaction identified, McCaffery was asked to report the date, price, parties to the transaction, number of head, location, and weight of the cattle. (Exhibit 305.)

(42) McCaffery put the requested information in a spreadsheet and faxed it to the Commission on December 8, 2003. (Tr. 486 (McCaffery); Exhibit 306.) The details of Transactions A-D were included on the spreadsheet; however, McCaffery did not indicate on the sheet that either Transaction A or Transaction B had been rescinded. (Tr. 487-88 (McCaffery).)

(43) McCaffery did not indicate that Transactions A or B had been rescinded because he had not been asked for this information. (Tr. 487-88 (McCaffery).) At all times, McCaffery provided the Commission with what he understood it to be requesting. (Tr. 485-88 (McCaffery).)

(44) In the spreadsheet, McCaffery only identified the purchasers for each transaction. If North Platte Feeders was the purchaser, it was identified in the spreadsheet, but the seller was not. The other party was therefore only identified by the spreadsheet if it was purchasing cattle from North Platte. (Exhibit 306.) On December 15, 2003, in response to the Commission's request for more information, McCaffery identified where the cattle that were involved in Transactions B, C and D had come from. (Tr. 488-89 (McCaffery); Exhibits 307, 1121.) On December 29, 2003, McCaffery responded by fax to another request for information by identifying the sellers in Transactions A, B and C. (Tr. 490 (McCaffery); Exhibit 304.)

-16-

McCaffery felt he was appropriately responding to the Commission's requests and was not trying to hide any information.  (Tr. 486-90 (McCaffery).)

## 2.  Transaction B

(45)  On or around October 20, 2003, Delay sold, on behalf of himself and a group of investors, 124 feeder cattle, estimated at 775 pounds per head, to North Platte Feeders.  (Tr. 469-70 (McCaffery); Tr. 718 (Delay).)   This transaction is referred to as Transaction B.

(46)  The 124 cattle involved in Transaction B were part of a group of 172 steers, all of reportable weight, owned by Delay and a group of investors, and managed by NPF.  (Tr. 717 (Delay); Tr. 468 (McCaffery).)   Delay owned the remaining 48 head.  (Tr. 469 (McCaffery).)

(47)  McCaffery had originally purchased the cattle on behalf of Delay and the other investors and had placed the cattle on grass under a pasture lease in Oconto, Nebraska in June 2003.  (Tr. 717 (Delay); Tr. 468 (McCaffery); Exhibit 2012.)

(48)  In mid-October 2003, Delay called McCaffery to find out if NPF was interested in purchasing the 124 steers owned by the Delay group.  Delay did not want to sell the 48 head of cattle that he owned individually. (Tr. 469 (McCaffery).)

(49)  At the time the parties agreed to the sale, McCaffery had not seen the cattle.  (Tr. 471 (McCaffery).)

(50) The market price for the Transaction B cattle was computed by examining the prevailing market prices in Nebraska sale barns at the time of the transaction.  (Tr. 719-20 (Delay); Exhibit 1099, p. 3 (McCaffery).)

(51)  Purchasing cattle at an estimated weight is a standard industry practice. (Tr. 720 (Delay); Tr. 633 (Dr. Hutcheson).[16])  The USDA considers reported sales based upon estimated weights to be properly reportable.  (Widga Dep. 83-84.)

(52)  There were no scales in the grass pasture in Oconto, so the parties could not weigh the cattle.  (Tr. 720 (Delay).)  McCaffery estimated the weight of the cattle by multiplying the number of days that the cattle had been on grass by a pound and a half a day.  (Tr. 720 (Delay); Tr. 470 (McCaffery).)  It is a rule of thumb in the cattle industry that cattle on grass are expected to gain a pound and a half each day. (Tr. 470 (McCaffery); Tr. 642 (Holcomb).[17])

(53)  If the Transaction B cattle had gained the expected 1.5 pounds per day while on grass, the cattle would have weighed between 775 and 800 pounds on the delivery date.  The cattle only weighed 647 pounds per head when delivered.  (Tr. 470 (McCaffery).)

(54)  Although McCaffery could have forced the sale, McCaffery called Delay and offered to rescind the transaction so that Delay's investors could finish the cattle and have a chance to recover their investment.  McCaffery felt responsible for the poor performance of the Transaction B cattle because he had been in charge of feeding the cattle and had made the decision to keep them feeding on grass in Oconto. (Tr. 470-71 (McCaffery).)

(55)  The parties did not know that the cattle were underweight when they agreed to the sale.  (Tr. 472 (McCaffery).)

---

[16] David Hutcheson, an expert retained by Delay, is a private consultant for feedyards in the United States and internationally.  (Tr. 624.)

[17] Gary Holcomb, an expert retained by Delay, is a consulting nutritionist for North Platte Feeders and 26 other feedyards in western states (Tr. 639-41.)

(56)  North Platte Feeders paid for three trucks to trailer the cattle from Oconto to North Platte.  Based on the cattle's actual weight upon delivery, only two trucks would have been necessary to retrieve the cattle.  (Tr. 471-72 (McCaffery).)

(57)  North Platte Feeders made an adjustment to the Delay investors' pasture lease to account for the poor performance of the cattle and reimbursed the Delay investors for feed charges that had been previously paid.  Wade Pearson, the manager of Riverside Feeders in Oconto, agreed to pay one-half of the price reimbursed to the investors.  (Tr. 472-73 (McCaffery).)

### 3.  Transaction C

(58)  On October 21, 2003, Delay sold, on behalf of a group of investors, 666 feeder cattle, estimated at 837 pounds per head, to North Platte Feeders for an average price of $1.1183 to $1.13 per pound.  (Tr. 474-75 (McCaffery); Tr. 724-26 (Delay) Exhibit 1099, pp. 5-6 (McCaffery).)  This transaction is referred to as Transaction C.

(59)  The Delay investors had originally purchased the Transaction C cattle on September 17, 2003.  (Tr. 575 (Kleidosky).[18])  This is the date that the cattle first arrived at North Platte Feeders.  (Tr. 521 (Kleidosky).)

(60)  By selling the cattle to NPF, the Delay investors realized a profit of $60 per head, for a total of $40,000, based on prevailing rates.  (Tr. 725 (Delay).)  It made good economic sense to lock in a profit of $60 a head.  (Tr. 791-92 (Hayenga).)

(61)  North Platte Feeders invoiced its customers for feed and yardage on the 15th of each month, and the last day of each month.  If an invoice is sent to a customer on a date other than the 15th or the last date of the month, it is an indication

---

[18] Bette Kleidosky is the office manager for North Platte Feeders.  (Tr. 519.)

that something happened as of that date: the cattle have either been shipped or sold to another party.  The October 21, 2003 invoices to the Delay Group show that the Transaction C cattle were sold as of that date. (Tr. 522-23 (Kleidosky); Exhibit 2026.)

(62)  "Lot close-out reports", kept in the ordinary course of business at North Platte Feeders, tell customers how their cattle performed up to the sale date and what charges were associated with the cattle. The reports also provide information on the purchaser of the cattle.  The date of the sale of the cattle is listed at the top of the lot close-out reports directly under "North Platte Feeders."  The reports show that the sale from the Delay group to North Platte Feeders occurred on October 21, 2003.  (Tr. 523-24 (Kleidosky); Exhibit 2028.)

(63)  The "settlement for financed cattle forms", kept in the ordinary course of business at North Platte Feeders, also show that the Delay investors purchased the Transaction C cattle on September 17, 2003 and sold them on October 21, 2003.  (Tr. 574-75 (Wever)[19]; Exhibit 2039.)

(64)  On October 31, 2003, North Platte Feeders erroneously sent feed invoices for the Transaction C cattle to the Delay investors, for the period October 16-31, 2003.  The error was made because the North Platte Feeders' office was falling behind in invoicing and had to get people without experience to help with the process.  (Tr. 526-27 (Kleidosky); Tr. 576 (Wever).)

(65)  NPF discovered the erroneous invoices when it later completed the "sale entire lot forms" for the Transaction C cattle.  None of the Delay investors were ultimately charged for the feed and yardage after October 21, 2003.  The charges from October 21, 2003, forward were invoiced to the new owner.  (Tr. 527 (Kleidosky);

---

[19] Danya Wever is NPF's cattle administrator.  (Tr. 573-74.)

Beery [20] Dep. 61-66.)  Further, the investors were not charged interest for financing of the cattle after the October 21, 2003 sale date.  (Beery Dep. 55-60.)

(66)   The accounts receivable aging reports, kept in the ordinary course of business at North Platte Feeders, for each of the Delay investors show that there were no charges posted for the Transaction C cattle after the October 21, 2003 sales date. (Tr. 528-29 (Kleidosky); Exhibit 2030.)

(67)  On November 13, 2003, North Platte Feeders sold a "realizer" steer (*i.e.*, a steer that was not performing well) from the Transaction C cattle to a packing plant. (Tr. 532-33 (Kleidosky); Ex. 2031.)

(68)  The sale of the Transaction C cattle to NPF was based on an estimated weight.  However, the cattle had been weighed when they entered the yard three to four weeks prior to the transaction date.  (Tr. 725-26 (Delay).)

(69)  Estimating the cattle's weight was deemed preferential to taking a scaled weight because taking them off of feed to get actual scale weights would result in the cattle losing weight.  Every time cattle are weighed, a week's worth of production is lost.   (Tr. 475-76 (McCaffery).)   Estimating the cattle's weight under these circumstances is within the acceptable industry standards and practice. (Tr. 629 (Hutcheson); Tr. 649-50 (Holcomb).)

(70)   The Delay investors did not receive profit distributions for the Transaction C cattle until late February 2004.  (Beery Dep. 43-44.)  The distribution of sales proceeds was delayed because the promissory notes covering the Transaction C cattle were secured by an additional seven lots of cattle that were not part of the transaction.  (Tr. 480-81 (McCaffery); Tr. 529-31 (Kleidosky); Exhibit 2025; Beery

---

[20] Ron Beery was one of Delay's investors.

Dep. 60-61.)  Before the proceeds could be paid, the cattle and hedge positions of all 12 of the lots had to be liquidated.  (Tr. 481 (McCaffery); Tr. 728-29 (Delay); Tr. 540-42 (Kleidosky); Beery Dep. 60-61.)

(71)  Within the cattle industry, proceeds may not be distributed until hedge positions are closed and promissory notes cancelled.  (Tr. 353-54 (Adams)[21].)

(72)  North Platte Feeders did not receive close-out information for all of the hedge accounts until January 30, 2004.  (Tr. 541-42 (Kleidosky); Exhibit 2041.)

(73)  The remaining seven lots of cattle covered by the promissory notes were sold as fat cattle in December 2003 and January 2004.  (Tr. 729 (Delay).)

(74)  Once all of the lots were sold, and the liens and hedge accounts were cleared, the investors received their profits from Transaction C. (Tr. 541-43 (Kleidosky); Beery Dep. 60-61.)

(75)  The Transaction C paperwork took longer than expected because each of the 21 Delay investors owned a fractioned part of each lot of cattle.  This required the North Platte Feeders' office staff to complete 21 different sets of paperwork.  (Tr. 480-81 (McCaffery); Tr. 529-31 (Kleidosky).)

(76)  In December 2003, McCaffery received a call from his bankers saying that NPF owned too much inventory and he needed to liquidate some of its cattle.  McCaffery decided to sell the Transaction C cattle because they were big yearling cattle and the easiest to merchandise.  McCaffery called a number of people to see if anyone was interested in the cattle, including Delay. (Tr. 480 (McCaffery).)  Delay then contacted Matt Neil, who purchased the cattle in his individual capacity on

---

[21] Steven Adams, an expert retained by the Commission, previously managed feedlots in Texas and Kansas.  (Tr. 316-17.)

January 16, 2004.  (Tr. 239 (Neil); Tr. 726-27 (Delay); Tr. 480 (McCaffery); Exhibit 2032.)

(77)  Neil sent an equity check to North Platte Feeders for the Transaction C cattle on February 1, 2004, about two weeks after the January 16, 2004 sale date.  The check was deposited in NPF's account on February 9, 2004.  (Tr. 534 (Kleidosky); Exhibit 2035.)  It is standard industry practice to pay for the cattle within 30 days of the sale date.  (Tr. 242-43 (Neil).)

(78)  Neil also completed a promissory note and security agreement that covered the Transaction C cattle.  The promissory note was dated on October 21, 2003.  (Tr. 533 (Kleidosky); Tr. 240-41 (Neil); Exhibits 118, 2034.)

(79)  In the ordinary course of business, North Platte Feeders dates its promissory notes on the date that NPF takes possession of the cattle or the date that the cattle first arrive at NPF.  That way, North Platte Feeders does not lose any interest on its promissory notes with the cattle purchasers.  By dating the promissory notes as of the date the cattle entered the NPF lot, the purchaser of cattle also becomes responsible for all of the feed charges and other expenses that the cattle incur from the date of the promissory note forward. (Tr. 535 (Kleidosky).)

(80)  Feedyards commonly date promissory notes as of the date the cattle first came into their feedyard, so the date on the promissory note does not necessarily reflect the date cattle are sold to a subsequent purchase.  (Horton[22] Dep. 41-42.)

(81)  Neil sold the lots of cattle to slaughter on January 23, 2004, January 30, 2004, and February 1, 2004.  (Tr. 224, 241 (Neil); Exhibit 2036.)

---

[22] Wade Horton is a bank vice president.  (Horton Dep. 27.)

(82)  Delay never had any ownership interest in the Transaction C cattle.  (Tr. 724 (Delay).)

(83)  The purchase of cattle, already in the feedlot, from one customer to another, is properly reportable.  (Widga Dep. 90-91.)

### 4.  Transaction D

(84)  On October 16, 2003, Delay purchased, on behalf of himself and a group of investors, 1,598 feeder cattle from North Platte Feeders for $1.13 per pound.  (Tr. 483-84 (McCaffery); Tr. 729-31 (Delay)).  This transaction is referred to as Transaction D.

(85)  The Transaction D cattle had originally been purchased by McCaffery from a Nevada ranch in August 2003 for $1.065 per pound.  The cattle were delivered to North Platte Feeders in two shipments—the first on or about the 30th of September and the second shipment on or about the 7th of October.  (Tr. 482 (McCaffery); Tr. 544-49, 552-57 (Kleidosky); Exhibits 2043, 2054, 2065.)

(86)  Delay and McCaffery agreed upon a sales price based on the prevailing rate at Nebraska sale barns.  (Tr. 483-84 (McCaffery); Tr. 731 (Delay).)  Kleidosky prepared an invoice based upon an erroneous assumption that the sale was at the original purchase price of $1.065 per pound, but that invoice was destroyed after McCaffery informed her otherwise; Kleidosky then prepared a new invoice at the price of $1.13 per pound.  (Tr. 484 (Delay); Tr. 558-67 (Kleidosky); Exhibit 113.)

(87)  Danya Wever ("Wever") is the cattle administrator for North Platte Feeders, and is responsible for filling out the "lot hard cards" that show cattle intakes, sales, and moves.  (Tr. 584-85 (Wever).  The lot hard card at issue indicated that the

cattle came into the feedyard on September 30, 2003, and were owned by Delay and various partners in his investment group.  (Tr. 342-43 (Adams); Exhibit 128.)

(88)  The lot hard card at issue was filled out at two separate times, with two different pens.  The first section, covering the "in date" or date that the cattle arrived, the initial lot number, pen, number of head and average weight was filled out first. Wever then added information regarding the owner, customer, partnership, and check. (Tr. 585-86 (Wever).)

(89)  Wever often leaves the owner's designation open on the lot hard card if she knows that the cattle are going to be sold; therefore, it is likely that she added the owner information when NPF processed the sell entire lot form on October 16, 2006. (Tr. 586-87 (Wever).)

(90) Delay and his investors were invoiced for feed costs incurred by North Platte Feeders since the cattle arrived at the feedyard, but this was done pursuant to the parties' agreement and in accordance with the usual practice.  (Exhibits 347-353; Tr. 759-60 (Delay).)  There is no evidence that Delay or his investors made payment on any feed bills for the Transaction D cattle prior to the date of sale.  (Tr. 358-59 (Adams).)

### 5.  Transaction E

(91)  On October 21, 2003, Delay sold, on behalf of a himself and a group of investors, 1,538 feeder cattle, estimated at 829 pounds per head, to Imperial Beef for an average price of $1.1025 per pound.  (Tr. 265 (Lawless); Tr. 734 (Delay); Exhibit 1098, p. 1 (Lawless).[23])  This transaction is referred to as Transaction E.

---

[23] Exhibit 1098 is a declaration signed by Lawless on March 9, 2005.

(92)    Delay approached Lawless about selling the cattle to Imperial Beef, where they were already feeding. (Tr. 256 (Lawless).) Delay told Lawless that he had lined up a buyer, or thought he could find a buyer, to repurchase the cattle from Imperial Beef at a later date.  (Tr. 257 (Lawless); Tr. 733 (Delay).)

(93)  Delay wanted to sell the cattle because his investors wanted to realize the profit that they had made in the cattle at that time period.  (Tr. 732 (Delay).)  The price of feeder cattle had gone up substantially from the time that the investors had purchased the cattle. (Tr. 257-58 (Lawless).)

(94)  Delay and Lawless agreed upon a price that was based on the prices that had recently been reported in the Nebraska sales barns.  Lawless would not have agreed to the sale on behalf of Imperial Beef had the price been other that an arm's length negotiated prevailing market price.  (Tr. 270 (Lawless).)

(95)  Imperial Beef had financed the cattle for the Delay investors.  In order to clear the Delay investors of their responsibilities, Imperial Beef had to buy the cattle to pay off all of the notes and then settle with them before it could resell the cattle to another party.  (Tr. 292-93 (Lawless).)

(96)  Before reporting Transaction E to the USDA, Lawless met with Imperial Beef's Board of Directors to ensure that the Board felt that the sale should be reported.  (Tr. 275 (Lawless).)  The Board questioned Lawless on the specifics of the transaction before ultimately authorizing him to report the trade to the USDA.  (Tr. 276 (Lawless).)  Alan Janzen ("Janzen"), a partner at Imperial Beef, helped Lawless make the report to the USDA regarding Transaction E.  (Tr. 308-09 (Janzen).)

(97)  On November 25, 2003, Imperial Beef sold the Transaction E cattle to Gary Gabriel ("Gabriel"), who is a customer of Delay and a partner in Lloyd Neil &

-26-

Son.  (Tr. 734-36 (Delay); Tr. 273, 284-85 (Lawless).)  Gabriel was not part of the original investment group that sold the cattle to Imperial Beef.  (Tr. 734 (Delay).)

(98)  Between October 21, 2003, and November 25, 2003, Imperial Beef held the Transaction E cattle as opportunity cattle, or cattle that the Company purchases for delivery or hold at the feedyard to be resold prior to slaughter.  (Tr. 282-83 (Lawless).)  During this time, Imperial Beef was at risk for the loss of the cattle.  (Tr. 293-94 (Lawless).)  Feedyards are willing to accept the risk of holding opportunity cattle because it is in the feedyard's interest to keep the cattle in its yard.  (Tr. 294-95 (Lawless).)

(99) In late October 2003, Delay also offered to buy feeder cattle of reportable weight at another feedlot that Janzen owned, with a 5% down payment.  (Tr. 310 (Janzen).)  While a 5% down payment is far less than the industry standard, Delay would have utilized hedges to minimize the seller's risk and would have kept the cattle at the feedlot.  (*Id.*; Tr. 742-43 (Delay).)  Delay's offer was not accepted and no transaction was reported by Janzen.


## III.  CONCLUSIONS OF LAW

(100)  Transactions A, B, C, D, and E each involved a *bona fide* sale that was properly reportable to the USDA.

(101) Delay did not manipulate the October 2003 feeder cattle futures contract.

(102)  Delay did not attempt to manipulate the October 2003 feeder cattle futures contract.

(103)  Delay did not knowingly deliver, or cause to be delivered, any false, misleading or knowingly inaccurate report that affected or tended to affect the cash price of feeder cattle.

(104)  Delay did not violate the Commodity Exchange Act.

Accordingly,

IT IS ORDERED that judgment shall be entered by separate document dismissing the Commission's action with prejudice.

November 17, 2006.                    BY THE COURT:

                                      s/ *Richard G. Kopf*
                                      United States District Judge